Diane WOJCIK and John Wojcik, individually and on behalf of Mary Wojcik, Katherine Wojcik and Elizabeth Wojcik, Plaintiffs,

v.

TOWN OF NORTH SMITHFIELD, Alias, and Henrietta Delage, Alias in Her Capacity as Financial Director for the Town of North Smithfield, and the North Smithfield School Committee; Ann Cleary, Linda Porter, Jean Meo, Robert LaFleur, and John Powell, Individually and in Their Capacities as Members or Agents of the North Smithfield School Committee; Christine Davidson, Lorraine Nault, Richard Smith, Terri Leoni, Richard Brady, Charles T. Shunney, Alias and Deborah Mancuso, Individually and in Their Capacities as Members or Agents of the Town of North Smithfield; and the North Smithfield School Committee; the Rhode Island Rape Crisis Center, Inc.; Marion Marceau, Alias and Carol Costanza, Alias, Individually and in Their Capacities as Counselors of the Rhode Island Rape Crisis Center, Inc., Defendants.

Civ. A. No. 91–0405L.

United States District Court,
D. Rhode Island.

Jan. 4, 1995.

Amato DeLuca, Elizabeth McDonough Noonan, Mandell DeLuca & Schwartz, Providence, RI, for plaintiffs.

John E. Bulman, Paul Sanford, Christine M. Gravelle, Tillinghast Collins & Graham, Providence, RI, for R.I. Rape Crisis Center, Marceau & Costanza.

Marc DeSisto, Shannon Gilheeney, Carroll Kelly & Murphy, Providence, RI, for all other defendants.

*MEMORANDUM AND ORDER*

LAGUEUX, Chief Judge.

This matter is before the Court on plaintiffs' and defendants' objections to Magistrate Judge Lovegreen's Report and Recommendation of November 9, 1993. For the reasons discussed below, defendants' underlying motions for summary judgment are granted in part and denied in part.

## I. FACTS

This action arises out of two incidents in which various defendants allegedly filed false complaints for child abuse against John Wojcik and Diane Wojcik ("the Wojciks"). The Wojcik children, Mary, Katherine and Elizabeth, were students in the North Smithfield

School system. Both incidents unfolded in the context of a school day.

The first incident occurred on March 30, 1990. On that day, Marion Marceau ("Marceau") and Carol Costanza ("Costanza"), employees of the Rhode Island Rape Crisis Center ("RCC"), conducted a program on assault, abuse and victim blaming for sixth grade children at Halliwell Elementary School in North Smithfield. Mary Wojcik ("Mary") was among the students in the audience for this program. According to Mary, the students were told during the program that "all slapping [of children] was child abuse." The children were also told that an RCC employee would be available for questions and further discussion following the program.

After the program, several students, including Mary, voluntarily went to see Marceau to continue the discussion about abuse. Marceau was experienced in giving these types of programs for children. What occurred in the room with Marceau is in dispute. Marceau states that Mary began crying and told Marceau that her parents hit her frequently, that her father hit her most of the time, that no matter what she did she could not satisfy her parents, that she didn't know when to expect being hit, that her parents would not necessarily hit her for bad behavior, that her father would strike her in the face, that her father would pull her hair, that her father bruised her, that her father left red marks on her arms from twisting and pulling them, and that the situation was out of control.

Mary relays a different set of facts about her interaction with Marceau. She states that when one of the other students talked about a boy that was either kicked or pushed down a flight of stairs, that she began crying because the story was sad, that when Marceau asked if her parents hit her, that she replied in the affirmative, noting that any hitting in her home was done with her parents' hands, and that later, when asked if Mary was ever bruised, that she had been bruised. Mary also says that she was not asked, nor did she state, why or how frequently she was hit by her parents or the cause for her bruising. After her meeting

with Mary, Marceau decided to call the Rhode Island Department of Children and Their Families ("DCF"). The purpose of her call was to notify DCF that she suspected that Mary might be the victim of child abuse. Marceau informed Christine Davidson ("Davidson"), Halliwell Elementary School's principal, of her intent to call DCF and of her reasons for doing so. Davidson concurred, and Marceau called DCF. The DCF representative with whom Marceau spoke said that a DCF investigator would try to visit Mary at school before the day was done. Later, to accommodate the DCF investigator's schedule, the meeting with Mary was moved to 4:30 p.m. at the Wojcik home. Marceau pulled Mary out of her classroom to tell her that a DCF investigator would be visiting her at home.

A DCF investigator did visit the Wojcik home and asked the Wojciks questions. The Wojciks did not resist speaking with the DCF investigator, and indeed consented to talk with her. After the visit, the investigator determined that the report of abuse was unfounded. Thus ended the first incident.

The second incident occurred in January, 1991. This incident involved the middle Wojcik daughter, Katherine and her fourth- and fifth-grade teacher, Terri Leoni ("Leoni"). The incident involved a journal in which Katherine wrote during various parts of the school year. Leoni states that she had suggested to all students in her class that they voluntarily keep journals to practice writing. Leoni intended to read the journals randomly over the course of the year to monitor writing skills. According to Leoni, no child was told what to write or how frequently.

Leoni claims that from September, 1990 to January, 1991, she began to develop suspicions that Katherine was having trouble at home. In reaching this conclusion, Leoni relied on several different episodes of Katherine's behavior. First, Leoni recalled a particular event when Katherine wet her pants at school. Katherine refused to allow the school to call her parents because, Leoni says, Katherine stated that her sister Mary had had a similar incident and that Mary had been hit. Second, Leoni says that at various times during the first few months of school,

Katherine referred to incidents when her father yelled, hit and used a belt. In response, Leoni had provided her with a "1–800" number that helped victims of child abuse. Third, Leoni was surprised at how upset Katherine became when she received a "C" on a test.

Then, in early 1991, Leoni read Katherine's journal for the first time. In her journal, Katherine had written that her father hit her sister Elizabeth on the head a lot, that she is calm and relaxed when her father is gone, that her father hit her and her sisters "for doing something wrong," that she and her sisters were hit on Christmas Day, and that she was thinking about running away. Leoni states that she had witnessed no evidence of physical abuse on Katherine, that she had never heard Katherine say that she was being abused, and that she had not told Katherine what to write in the journal. Leoni did not speak to Katherine about the journal, but made a copy and showed it to the school principal, Davidson, and the school nurse, Lorraine Nault ("Nault"). Leoni states that she was unaware of the first incident involving Mary at the time she approached Davidson and Nault. Leoni also called the attorney for the National Education Association to figure out the best way to proceed. After deliberation, Davidson and Leoni jointly decided to call DCF.

On January 7, 1991, DCF agreed to investigate the case. Richard Cardin ("Cardin"), a DCF investigator, met with the youngest Wojcik daughter, Elizabeth, at Halliwell Elementary School and asked her questions. After his meeting with Elizabeth, Cardin was informed that Katherine, the middle daughter, was being transported over to the Junior–Senior High School so that Cardin could question Katherine in the presence of her older sister, Mary. Diane and John Wojcik were notified by phone that their daughters were being questioned at the High School, and they were asked to attend. The Wojciks eventually were also questioned at the High School.

After the investigation, the case was closed. The Wojciks were cleared of the charges of abuse. Shortly thereafter, Kath-

erine transferred to another school, and Leoni notified DCF of this fact.

Katherine's deposition testimony characterizes the second incident quite differently, beginning with the work in her journal. Katherine states that she was the only student in the class to keep a journal and that she did so because Leoni asked her to write down "the bad things." Katherine stated that not everything she wrote was true and that it was written to please Leoni, but never told Leoni so.

Katherine also states that she was taken against her will to Mary's school for the investigation. She was placed in the principal's car with Nault and driven to the school, where she was first prevented from leaving the vehicle and then, after a period of time, allowed to join her sister Mary. It was not until after the questioning by the DCF representative that Katherine and Mary were allowed to join their parents, who had been called to the school to meet with the DCF investigators.

Cardin, the DCF investigator, states that he did not request the transportation of Katherine to Mary's school. Cardin also states that all three children said they were hit by their father, but only when they did something wrong. It was Cardin who came to the conclusion that the Wojciks were not abusing their children, after his investigation and questioning were complete.

Following the second incident, the Wojciks filed this lawsuit in state court, seeking redress for having to undergo two allegedly unfounded child abuse investigations. The RCC and Town defendants removed the case to this Court, since the complaint contained federal claims. On November 6, 1992, this Court granted a motion to dismiss the charges against the School Committee and granted the individual School Committee members' motion to dismiss Counts III, XIII, XVII, XVIII, XXI, XXII, and XXV—XXVIII. Thereafter, all defendants moved for summary judgment. On November 9, 1993, Magistrate Judge Lovegreen delivered a Report recommending that defendants' motions for summary judgment be granted in part and denied in part. Defendant Rape Crisis Center filed an objection to the scope

of Judge Lovegreen's Report. Plaintiffs also filed a objection to the Report and, on December 27, 1993, agreed to drop Counts XV, XVII, XXVI, and XXXI against the Rape Crisis Center, Marceau and Constanza. After argument on January 12, 1994, this Court took the objections to Judge Lovegreen's Report under advisement. The matter is now in order for decision.

## II. Standard of Review

In reviewing a magistrate judge's Report and Recommendation,

"[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence...."

28 U.S.C. § 636(b).

■ In this case, defendants' motions for summary judgment had been referred to Magistrate Judge Lovegreen for preliminary review, findings, and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local Rule of Court 32(c)(2). By invoking Federal Rule 56, the moving party effectively declares that the evidence is insufficient to support the nonmoving party's case. *U.S. v. One Parcel of Real Property with Bldgs., Appurtenances, and Improvements, known as Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I.,* 960 F.2d 200, 204 (1st Cir.1992). Summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must examine the record in the light most favorable to the nonmoving party and indulge all reasonable inferences in that party's favor. *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir. 1994).

■ The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). "A 'genuine' issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either party.... [A] genuine issue exists if there is sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *Maldonado–Denis,* 23 F.3d at 581.

The materiality determination rests on the substantive law's identification of which facts are critical and which facts are irrelevant. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. A material issue of fact is one that may affect the outcome of the suit under the governing law. It is, therefore, an issue which needs to be resolved by the finder of fact before the related legal issues can be decided. *Maldonado–Denis,* 23 F.3d at 581. At the summary judgment stage, the court must decide whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

## III. Background

The defendants in this case comprise two categories. The first category—which includes the Rape Crisis Center, Inc., Marceau and Costanza—will be referred to throughout this opinion as the "RCC defendants." The RCC defendants' involvement in this lawsuit is limited to the "first incident," or the incident in which Marceau's interaction with Mary compelled her to call DCF. The second category of defendants—which includes the Town of North Smithfield, Henrietta Delage (Financial Director of the Town of North Smithfield), the members of the North Smithfield School Committee in their individual capacities,[1] Charles T. Shunney (Superintendent of the North Smithfield School system), Davidson (Principal at Halliwell Ele-

---

1. This Court issued an order on November 6, 1992 dismissing Count III (§ 1983), Count XIII (negligence), and Counts XVII, XVIII, XXI, XXII, XXV, XXVI, XXVII, and XXVIII (various intentional torts) against the School Committee Members in their individual capacities.

mentary School), Richard Smith (Principal at North Smithfield Junior High School), Nault (School Nurse at Halliwell), Leoni (Katherine's teacher at Halliwell), Richard Brady (teacher at Halliwell), and Deborah Mancuso (Guidance Counselor at North Smithfield Junior High School)—will be referred to as the "Town defendants."[2] The Town defendants' involvement in this lawsuit is generally limited to the "second incident," or the incident in which Leoni and Davidson called the DCF after reading Katherine's journal. To some extent, the Town defendants are involved in the first incident.

Both the Wojciks and the RCC defendants have filed objections to the Report and Recommendation of Magistrate Judge Lovegreen ("Report"), dated November 9, 1993. The matter had been referred to Magistrate Judge Lovegreen for consideration of motions for summary judgment brought by both the Town defendants and RCC defendants. In his Report, Judge Lovegreen considered two issues. First, he considered defendants' motion for summary judgment as to the state law counts, based on their argument that they were immune from the state law causes of action under R.I. Gen Laws § 40–11–4. Judge Lovegreen denied defendants' motion for summary judgment, since § 40–11–4 only grants immunity from state law claims when the reporting is done "in good faith," and whether the reporting was done in good faith was a question of fact inappropriately resolved on a motion for summary judgment. Second, Judge Lovegreen considered the causes of action brought by the Wojciks pursuant to 42 U.S.C. § 1983. Here, the Report made two recommendations. First, Judge Lovegreen recommended that the Town defendants' motion for summary judgment be granted as to Counts I, II, and III, to the extent that the Wojciks' claims are based on a violation of the constitutional right to familial integrity. *See, e.g., Frazier v. Bailey,* 957 F.2d 920 (1st Cir.1992). Second, Judge Lovegreen recommended that the RCC defendants' motion for summary judgment be granted as to Counts IV, V, VI and VII. Judge Lovegreen based his ruling on the

finding that the Rape Crisis Center defendants were qualifiedly immune from the causes of action brought under 42 U.S.C. § 1983. Judge Lovegreen did not reach the question of whether the RCC defendants are state actors for purposes of § 1983.

Essentially, the Wojciks have objected to the Report because it goes too far, and the Rape Crisis Center defendants have objected because it does not go far enough. In substance, the Wojciks' Objection to the Report is based on two arguments: (1) that Judge Lovegreen incorrectly applied the qualified immunity doctrine to both sets of defendants, and (2) that Judge Lovegreen erred in holding that the right to familial integrity is not a clearly established constitutional right. On the other hand, the Rape Crisis Center defendants agree with the Report's application of the relevant qualified immunity and constitutional doctrines, but disagree with the scope of the Report to the extent that it fails to grant summary judgment as to Counts XI, XII, XV, XVII, XIX, XX, XXIII, XXIV, XXV, XXVI, XXVII, XXVIII, XXIX, XXX and XXXI. The Town of North Smithfield Defendants also agreed with the Report's application of the applicable qualified immunity and constitutional doctrines, but made no individual objection to the Report's scope.

## IV. The RCC defendants and the first reporting incident

Plaintiffs have brought a barrage of counts relating to the first incident against the RCC defendants. Principal among those are Counts IV, V, VI and VII. Each of those counts alleges a violation of 42 U.S.C. § 1983, and each names the RCC defendants in two combinations: Counts IV and V name the RCC itself; Counts VI and VII name Marceau and Costanza, the RCC employees. Counts IV and VI were brought by the Wojciks; Counts V and VII were brought by the Wojcik children. Counts IV through VII provide the basis for the Court to exercise federal question jurisdiction as to the first incident. Aside from Counts IV—VII, the following pendent state law counts are still

---

**2.** Originally, the School Committee was named as a defendant. However, this Court issued an opinion dismissing all Counts naming the School Committee as a defendant, since it was an improper party.

alive as to the first incident: X (negligence), XI (negligence), XII (negligent hiring), XIV (negligence), XIX (intentional infliction of emotional distress), XX (intentional infliction of emotional distress), XXIII (negligent infliction of emotional distress), XXIV (negligent infliction of emotional distress), XXVII (civil conspiracy), XXVIII (civil conspiracy), XXIX (punitive damages), and XXX (punitive damages).

### A. 42 U.S.C. § 1983 Claims

The RCC defendants have moved for summary judgment with respect to Counts IV, V, VI, and VII for two reasons. First, the RCC defendants argue that they are not state actors and, hence, not properly suable under § 1983. Second, the RCC defendants argue that they enjoy qualified immunity from plaintiffs' cause of action because plaintiffs have not alleged a violation of a clearly established constitutional right. Plaintiffs dispute these arguments, and this Court will now consider them *seriatim.*

Plaintiffs must assert two essential elements in order to sustain a cause of action under 42 U.S.C. § 1983. First, plaintiffs must assert that the conduct complained of was committed by a person acting "under color of state law." Second, plaintiffs must assert that the conduct deprived them of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Gutierrez-Rodriguez v. Cartagena,* 882 F.2d 553, 559 (1st Cir.1989); *Werle v. Rhode Island Bar Ass'n,* 755 F.2d 195, 197 (1st Cir. 1985); *Jones v. Rhode Island,* 724 F.Supp. 25, 30 (D.R.I.1989). In this case, plaintiffs have asserted that the RCC defendants acted under color of state law as agents of the North Smithfield School system and that their actions violated the Wojciks' constitutional right to familial integrity.

■ In order to prove that the RCC defendants acted "under color of state law," the Wojciks must show that the actions of the RCC defendants are chargeable to the state, or constitute state action. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935, 102 S.Ct. 2744, 2752, 73 L.Ed.2d 482, 494 (1982). Objectionable conduct is considered state action when two conditions are satisfied: 1) the objectionable conduct must be caused by some right, privilege or rule of conduct created by the state or by a person for whom the state is responsible, and 2) the party charged with the conduct must be a person who may fairly be said to be a state actor. 457 U.S. at 937, 102 S.Ct. at 2753. Action by a private party in compliance with a statute is not sufficient to justify a characterization of that party as a "state actor." *Id.* at 939, 102 S.Ct. at 2754. However, "private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of § 1983.... It is enough that the defendant is a willful participant in joint activity with the State or its agents." *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267, 272 (1966). If the defendants are not state actors, then a § 1983 claim must be dismissed for failure to state a claim. *Werle,* 755 F.2d at 198.

■ The RCC defendants are involved in this case through the overt actions taken by Marceau and Costanza. Pursuant to the contract between the RCC and the North Smithfield School system, Marceau and Costanza came into the school to conduct a program for the education and the benefit of the students. Essentially, Marceau and Costanza stood in the shoes of teachers. "'It is the [RCC defendants'] function within the state system, not the precise terms of [their] employment, that determines whether [their] actions can be fairly attributed to the state.'" *Frazier v. Bailey, supra,* 957 F.2d 920, 928 (1st Cir.1992) (quoting *West v. Atkins,* 487 U.S. 42, 55–56, 108 S.Ct. 2250, 2259, 101 L.Ed.2d 40, 54 (1988)). As school presenters, Marceau and Costanza performed functions typically delegated to the state's educators. They were hired to employ their educational expertise. Their presentation was required by the terms of a contract which the RCC entered into with the North Smithfield School system. Therefore, this Court concludes that the RCC defendants acted under color of state law for purposes of § 1983. As a result, they are properly before this Court as defendants in a suit brought under § 1983.

However, proving that the RCC defendants are state actors does not mean that

plaintiffs have successfully defeated the defendants' motion for summary judgment. Plaintiffs also have the burden to show "both the existence of a federal constitutional or statutory right, and some deprivation of that right as a result of defendants' actions under color of state law." *Watterson v. Page,* 987 F.2d 1, 8 (1st Cir.1993); *Valdivieso Ortiz v. Burgos,* 807 F.2d 6, 7 (1st Cir.1986). Moreover, in this case, plaintiffs must also rebut the affirmative defense that defendants have raised: qualified immunity under § 1983. Plaintiffs can do neither one of these things.

## 1. The Existence of a Federal Constitutional or Statutory Right

The constitutional right upon which plaintiffs have based their claim against the RCC defendants is the "constitutional right to familial integrity."[3] Such a right, plaintiffs claim, was violated when Marceau asked the DCF to investigate the Wojciks for child abuse. Presumably, Costanza is involved in the deprivation of this right through her participation in the program at Halliwell Elementary School, though this is nowhere made clear, and the RCC is involved through the principles of supervisory liability. The Wojciks argue that these defendants are liable under § 1983 because they catalyzed an unfounded and abusive child abuse investigation that deprived the Wojciks of their constitutional right to familial integrity.

The United States Supreme Court has long recognized that the intangible fibers that connect parent and child merit reasonable constitutional protection through the Due Process Clause of the Fourteenth Amendment. *See Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). A parent's "desire for and right to 'the companionship, care, custody, and management of his or her children' " is an interest that the

Court has termed "far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599, 610 (1982). The Court has specifically protected the integrity of the family by holding that the government may not interfere in certain private family decisions, such as decisions regarding the rearing of one's young children, *see Meyer v. Nebraska, supra,* and that when the state seeks to change or affect the relationship of parent and child, the state must adhere to rigorous procedural safeguards. *Valdivieso Ortiz, supra,* 807 F.2d at 8.

At the same time, however, the Supreme Court "has refused to find that a biological relationship between parent and child is, by itself, a fundamental relationship worthy of any constitutional protection." *Frazier, supra,* 957 F.2d at 930.

The Court's reservation is justified, since the strength of the liberty interest that parents have in maintaining a family does not find its roots in biology alone. The picture of the family, and of the liberty interests that embrace it, is more complex. This is due in part to the fact that the family exists within a society in which conduct is measured and overseen by the state and in which the state may literally act as *parens patriae.* So, in determining the nexus of rights between parent, child, and state, a parent's amorphous liberty interest is continually balanced against a countervailing governmental interest: the preservation of the welfare of children. This state interest can, and at times indeed does, supersede a parent's interest in raising a family free from governmental influence. Thus, while the Supreme Court has recognized an abstract fundamental liberty interest in "family integrity," the Court has never found that interest to be absolute or unqualified. 957 F.2d at 929. The state may act in the best interests of children, even when doing so interferes with the structure of the family and denies parents the autonomy to raise their own children. The relationship between parent and child may be investigated and terminated by the state, provided

---

3. Though it is unclear from the complaint, plaintiffs' constitutional right to familial integrity is presumably derived from the principles of substantive due process.

constitutionally adequate procedures are followed. *Watterson, supra,* 987 F.2d at 8.

■ At this point, it is instructive to observe two significant aspects against which the Wojciks have not brought constitutional challenge. First, plaintiffs do not challenge the laws of the State of Rhode Island that pertain to the reporting of child abuse. Those laws, particularly R.I.Gen. Laws §§ 40–11–3 and 40–11–4, are relevant to the actions of Marceau for two reasons: the former *requires* that Marceau report any reasonable suspicions of child abuse to DCF; the latter saves Marceau harmless from liability if her report to the DCF is made in good faith. Plaintiffs reference neither of these laws in their § 1983 challenge. Second, plaintiffs do not challenge the constitutionality of the conduct of the investigation. Indeed plaintiffs *cannot* make such a challenge, since they *consented* to talk to the DCF investigator in their own home. Their consent constituted an effective waiver of their due process rights.

The single fact to which plaintiffs do object is Marceau's decision to call the DCF. Plaintiffs have argued that Marceau's decision to call the DCF was deliberately reckless and that her call deprived the Wojicks of their liberty interests in the care, custody and protection of their children. In other words, plaintiffs have used twenty-one counts of a thirty-two count complaint—four § 1983 claims, and seventeen pendent state claims— and have brought these claims against at least three defendants *to attack Marceau's decision to call the DCF.* Even at the outset, the shortcomings of plaintiffs' claims are manifest.

### a. § 1983 claims brought against Marion Marceau

■ The fundamental flaw in the Wojciks' case against Marceau is that the *facts* do not add up to *any* constitutional violation, including a deprivation of plaintiffs' liberty interests in the care, custody, and control of their children. In fact, if the Constitution says anything to the facts of this incident, it *permits* Marceau's conduct, since she acted pursuant to a state law that is valid under the due process clause. *Accord Watterson, supra,* 987 F.2d at 7.

■ Plaintiffs' claim that Marceau's call to the DCF violated their constitutional right to familial integrity is totally misplaced. "The concept of familial privacy has been restricted by the Supreme Court to (1) thwarting governmental attempts to interfere with particularly intimate family decisions, and (2) voiding government actions that sever, alter or otherwise affect the parent/child relationship." *Hodge v. Jones,* 31 F.3d 157, 163 (4th Cir.1994).

■ Marceau's call to the DCF cannot be classified under either of these proscribed categories; it is not the type of action from which the state must refrain in order to preserve a family's integrity. Plaintiffs' conclusory allegation that an investigation *to which they consented* "affected" their relationship is utterly unsupported by any evidence and postulates an injury different in nature and diluted in degree from the ones that the Court has rectified. A simple investigation, without more, causes nothing but an exceedingly *de minimis* interference with a family's integrity, and such interference cannot possibly rise to the level of a constitutional violation. Therefore, Marceau's decision to call the DCF contains not one iota of constitutional misconduct.

To find for plaintiffs, this Court would have to hold that the substantive due process protections that have been formulated by various courts to protect the structure of the family sweep so broadly as to eclipse the procedural due process obligations of the state and thus create "islands" of families immune from state investigation. This Court unequivocally declines this unprecedented and unwarranted invitation. On the contrary, this Court does hold that any constitutional protection for familial integrity does not include a constitutional right to be free from child abuse investigations. *Watterson, supra,* 987 F.2d at 8 ("The right to family integrity clearly does not include a constitutional right to be free from child abuse investigations.") (citations omitted); *Hodge v. Jones, supra,* 31 F.3d at 164 (no constitutional right to be free from child abuse investigations). A contrary holding would require

this Court to set sail on unchartered seas of constitutional rights, guided only by the navigational insights of plaintiffs' theories. And frankly, neither this Court, nor any other to this point, has been willing to make that journey.

In *Hodge v. Jones, supra,* the Fourth Circuit considered the question of whether a state could constitutionally retain records that certain persons had been the subject of an investigation for child abuse, even after the investigatees had been cleared of the charges of abuse. Plaintiffs had brought suit, alleging that the state's record-keeping practice offended their constitutionally protected liberty interest in preserving the integrity of their family. However, in finding that the state's record-keeping procedures offended no constitutional rights, the Court wrote that

> "the pale shadow briefly cast over [the plaintiffs] by defendant's actions cannot be classified within either of the lines of Supreme Court familial privacy cases, and thereby constitutes '[s]tate action' that affects the parental relationship only incidentally ... [and] is not sufficient to establish a violation of a [sic] identified liberty interest."

31 F.3d at 164 (citing *Pittsley v. Warish,* 927 F.2d 3, 8 (1st Cir.1991)). The Wojciks do not even stand on a footing as firm as the plaintiffs in *Hodge,* who at least unsuccessfully complained of a practice by the state that both associated them with child abuse beyond the time of the investigation and had potentially *tangible* effects on their professional lives. So, in this case, the claimed deprivation falls short of even the 'pale shadow' of a deprivation considered in *Hodge.*

■ Even if Marceau had a motive for starting the investigation—a scenario utterly incompatible with the facts of this case—the Wojciks would have no constitutional basis for challenging her decision. In determining that an investigation was warranted, Marceau exercised what might be considered a modified form of prosecutorial discretion. And as the Supreme Court has held previously, state actors who exercise judgment akin to prosecutorial discretion and who, in the exercise thereof, cause injury, are abso-

lutely immune from suit. *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

■ Due process considerations do linger at the edges of this case, but they are procedural considerations, and not substantive ones. Procedural due process restricts the state *after it begins to investigate,* and it requires that the state be fair. Before the state investigates, however, it is unconstrained by due process and may bring an investigation for any reason. Fairly conducted investigations, brought for any reason, do not violate, nor even implicate, any constitutional rights of the investigated family by reason of their very existence.

There is no doubt that there is a constitutionally protected liberty interest that parents have in the control, custody and care of their children. But as this Court has already stated, such a liberty interest is clearly not absolute. *See Stanley v. Illinois, supra.* This liberty interest must be balanced against the government's interest in insuring the welfare of children, and this liberty interest cannot be used to restrict the pool of families that the state chooses to investigate in furtherance of this goal. While it would certainly offend the Constitution if an investigation was conducted abusively, or if the parent's relationship with their children were altered by an improperly conducted investigation, or assuredly if children were taken away from their parents without due process, no such things happened at any time during the first incident.

Since Marceau committed no act that deprived plaintiffs of their constitutional rights, this Court grants Marceau's motion for summary judgment on Counts VI and VII.

**b. § 1983 claims brought against Carol Costanza**

■ Counts VI and VII also name Costanza as a defendant. Plaintiffs claim that Costanza also deprived them of their constitutional rights. However, plaintiffs support this claim with no facts *whatsoever.* The only mention of Costanza in the Complaint places her in front of the classroom with Marceau, giving a presentation about assault,

abuse, and victim blaming, and charges her with the statement that "all slapping [of children] is abuse." Beyond these allegations, plaintiffs have neither alleged any constitutionally suspect conduct by Costanza, nor have they produced a shred of evidence to support their baseless claims. Plaintiffs' Complaint against Costanza is insufficient as a matter of law.

■ No possible view of the facts exposes Costanza under § 1983. Even assuming that the constitutional right to familial integrity exists, Costanza did nothing to deprive the Wojciks of this right. Costanza was uninvolved in the determination to call DCF, and she was not in the room when Marceau interacted with Mary. Labelling the collaboration of Marceau and Costanza as a "conspiracy" adds nothing to the charge. Mere conclusory allegations that defendants "conspired" are not enough in a civil rights complaint to turn otherwise lawful actions into a valid claim of unlawful conspiracy. *Watterson, supra,* 987 F.2d at 8 n. 7. The most that can be said about Costanza's involvement in this case is that she helped Marceau to present a program at the North Smithfield Middle School. That can hardly be said to be a constitutional violation.

Therefore, the Court grants Costanza's summary judgment motion as to Counts VI and VII. At this point, the Court need go no further with regard to the § 1983 claim against Marceau and Costanza. This Court has held that Marceau and Costanza's actions did not cause a deprivation of any rights guaranteed to plaintiffs by either the Constitution or laws of the United States. But beyond the fundamental flaw in plaintiffs' prima facie case, there is another reason that plaintiffs claim fails. Marceau and Costanza have an affirmative defense. They are immune from suit.

## 2. Qualified immunity under § 1983

■ As a preliminary matter, this Court must determine whether Marceau and Costanza are entitled to raise a defense of qualified immunity in this case. In *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the Supreme Court had left undecided the question of whether private parties found to be state actors for purposes of § 1983 could assert a defense of qualified immunity. In this Circuit, however, the question was resolved for purposes of this case in *Frazier v. Bailey, supra.* In that case, the Court of Appeals held that "[private individuals], under contract with the government, are entitled to raise a qualified immunity defense because they are the equivalent of public officials." *Id.* at 929. Here, Marceau and Costanza acted under contract with the government and gave a presentation as representatives of the school. As a result, Marceau and Costanza acted as public officials, and they are entitled to raise the defense of qualified immunity.

The doctrine of qualified immunity attempts to balance the rights of citizens against the need to protect officials who are required to use their discretion in the exercise of their public functions. *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396, 403 (1982). Qualified immunity essentially shields all state actors from liability, except those who are plainly incompetent and those who knowingly violate the law. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271, 278 (1986).

■ Government officials performing discretionary functions are generally shielded from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow, supra,* 457 U.S. at 818, 102 S.Ct. at 2738; *Morgan v. Ellerthorpe,* 785 F.Supp. 295, 303 (D.R.I.1992). This general rule of qualified immunity is intended to provide government officials with the ability "reasonably to anticipate when their conduct may give rise to liability for damages." *Anderson v. Creighton,* 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523, 535 (1987). In that way, officials can police their own behavior, knowing that they will not be held personally liable for actions that do not contravene principles of clearly established law.

■ The question of whether a law is clearly established is appropriately before

this Court on a motion for summary judgment. It is well established that

> "[on a motion for] summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."

*Harlow, supra,* 457 U.S. at 818–19, 102 S.Ct. at 2738.

Whether or not a law or right is clearly established determines whether an official has acted with "objective good faith." If an official's action does not contravene clearly established law, then that act is considered legally reasonable and the official is granted immunity because he or she has acted in objective good faith. 457 U.S. at 815–19, 102 S.Ct. at 2736–38. Thus, Marceau must "make a sufficient showing of objective good faith, *viz.,* that at the time [she called the DCF] that the law was not 'clearly established' against [her action]," in order to be immune from suit. *de Abadia v. Izquierdo Mora,* 792 F.2d 1187, 1190 (1st Cir.1986).

■■■ A clearly established law or, in this case, a clearly established constitutional right, is one whose contours are sufficiently clear that a reasonable person would understand its terms and be able to measure his or her conduct against it. Pre-existing law would render the unlawfulness of an official's action apparent. *Creighton, supra,* 483 U.S. at 640, 107 S.Ct. at 3039. The First Circuit Court of Appeals has also stated that "clearly established" means:

> something less than requiring the public official to show that the principle of law did not exist, or there would be little left; there would be few cases on which officials could succeed.

*de Abadia, supra,* 792 F.2d at 1190. Marceau need not prove that her action was correct or even legal to be protected by qualified immunity. *See Scheuer v. Rhodes,* 416 U.S. 232, 241–42, 94 S.Ct. 1683, 1689, 40 L.Ed.2d 90, 100 (1974). She simply must prove that a reasonable person would not have concluded that her call to the DCF violated a clearly established constitutional right of the Wojciks.

■■■ The constitutional right on which the plaintiffs rely—the "right to family integrity" or the "right of familial association"—is not clearly established. *See, e.g., Hodge v. Jones, supra,* 31 F.3d 157 (4th Cir.1994); *Doe v. Louisiana,* 2 F.3d 1412 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *Frazier v. Bailey, supra,* 957 F.2d 920 (1st Cir.1992); *Hodorowski v. Ray,* 844 F.2d 1210 (5th Cir.1988). The right, to the extent that it does exist, has been established through a patchwork of legal opinions, and it enjoys different applications to different degrees in different courts. In *Frazier v. Bailey, supra,* the First Circuit stated that

> "while there may be a due process right of 'familial integrity' of some dimensions, the dimensions of this right have yet to be clearly established. Moreover, to the extent it is well-defined, the liberty interest is not absolute but rather balanced against the governmental interest.... Because the right to family integrity has not been so particularized as to put defendants on notice that their conduct was unlawful, [defendants] are entitled to qualified immunity as a matter of law."

957 F.2d at 931. The same holds true today.

The arguments that the parties make about a constitutional right to family integrity also demonstrate that the right is not clearly established. Both the plaintiffs and the defendants cite *Frazier v. Bailey,* as support for their respective positions. Since the parties both cite the same case for antithetical positions, the case cannot set forth clearly established law. Rather, its terms and holding are sufficiently flexible to spawn reasonable debate between opposing counsel as to the meaning of the language therein. If clearly established law means anything, it

surely means law which is unequivocal, as well as reasonably known.

In sum, since the substance of the penumbral right of familial integrity enjoys no clear understanding in the law, the right is not clearly established, and defendants are qualifiedly immune from suit.

Therefore, this Court holds that even if the facts of the case do amount to a constitutional violation, that summary judgment is appropriately granted in this case on Counts VI and VII of the complaint because Marceau and Costanza are qualifiedly immune from suit.

### 3. The RCC and Respondeat Superior Theories under § 1983

Standing behind Marceau and Costanza in this case is their employer, the Rhode Island Rape Crisis Center. The RCC was named as an individual defendant in Counts IV and V of the complaint, which allege violations of 42 U.S.C. § 1983. The § 1983 claim against the RCC is based solely on its actions as the employer of Marceau and Costanza. Given this theory, the Court could simply find that the claims against the RCC must fail for the simple reason that Marceau and Costanza did not deprive plaintiffs of their constitutional rights. Therefore, even if there were direct respondeat superior liability under § 1983, the RCC could not be held liable. Yet, given this prima facie flaw in plaintiffs' case, this Court also opines that Counts IV and V against the RCC fail for two other reasons as a matter of law.

The first reason is that the RCC is immune from suit. Like Marceau and Costanza, the RCC is a person for purposes of § 1983. But also like Marceau and Costanza, the RCC cannot be held liable for its actions that do not violate clearly established principles of law. Since this Court has already held that the right to familial integrity is not clearly established, the RCC is immune from suit under § 1983 just as Marceau and Costanza are. *See Frazier, supra,* 957 F.2d at 931–32.

▮ The other reason that plaintiffs' claim against the RCC must fail is that liability under 42 U.S.C. § 1983 may not be based on principles of respondeat superior alone. A supervisor may be found liable only on the basis of his or her own acts or omissions. *Corrente v. R.I. Department of Corrections,* 759 F.Supp. 73, 79–80 (D.R.I.1991); *Maldonado–Denis, supra,* 23 F.3d at 581–82; *Gutierrez–Rodriguez, supra,* 882 F.2d at 561–62. Here, the plaintiffs have charged the RCC with no actions that suggest independent, actionable culpability. The most significant transgression with which the RCC is charged is that it was negligent in hiring and training Marceau and Costanza. However, for the RCC to be held liable as a supervisor under § 1983, plaintiffs must prove that the RCC's behavior must be deliberate, reckless or callous, and there must be an affirmative link between the agent's misconduct and the action or inaction of supervisory officials. *Maldonado–Denis, supra,* 23 F.3d at 582. No reasonable interpretation of the facts, even when viewed generously in favor of plaintiffs, could sustain a version that would allow plaintiffs to meet their burden in this case.

Therefore, the Court grants the RCC's motion for summary judgment as to Counts IV and VI because Marceau and Costanza committed no constitutional wrongs chargeable to the RCC; because the RCC is immune from suit; and because there is no direct respondeat superior liability under § 1983.

### B. Pendent State Law Claims

In granting the RCC defendants' motion for summary judgment as to Counts IV, V, VI, and VII, this Court has dealt with all of the federal claims that name those defendants in various combinations. The RCC defendants have also moved for summary judgment as to all of the pendent state law claims that relate to the first incident. The basis for this motion is Chapter 11 of Title 40 of the Rhode Island General Laws, which provides statutory immunity for persons who report suspicions of child abuse to the DCF in good faith.

### 1. Pendent state law claims as to Marion Marceau

In determining whether Marceau is immune from liability, it is necessary to review

the Rhode Island general laws that concern the reporting of child abuse. Marceau admitted in her deposition that she was aware of Rhode Island's statutory regime at the time she reported her suspicions that Mary was being abused to the DCF.

For purposes of defendants' motion, the most significant of the statutes is R.I.Gen. Laws § 40–11–4. That statute states in relevant part:

> **Immunity from Liability.**—Any person participating in good faith in making a report pursuant to this chapter shall have immunity from any liability, civil or criminal, that might otherwise be incurred or imposed. Any such participant shall have the same immunity with respect to participation in any judicial proceeding resulting from the report.

Rhode Island also has a mandatory child abuse reporting statute at R.I.Gen.Laws § 40–11–3(a). That statute reads in pertinent part:

> Any person who has reasonable cause to know or suspect that any child has been abused or neglected as defined herein ... shall, within twenty-four (24) hours, transfer that information to the Department for Children and Their Families or its agent who shall cause the report to be investigated fairly.

Finally, Rhode Island also has a statute that penalizes persons for failing to report child abuse at R.I.Gen.Laws § 40–11–6.1. That statute states:

> **Penalty for failure to report or perform act.**—Any person, official, physician or institution required by this chapter to report known or suspected child abuse or neglect or to perform any other act who knowingly fails to do so or who knowingly prevents any person acting reasonably from doing so shall be guilty of a misdemeanor and upon conviction thereof shall be subject to a fine of not more than five hundred dollars ($500) or imprisonment for not more than one year or both. In addition, any person, official, physician, or institution who knowingly fails to perform any act required by this chapter or who knowingly fails to perform any act required by this chapter or who knowingly prevents anoth-

er person from performing a required act shall be civilly liable for the damages proximately caused by that failure.

Rhode Island has clearly developed a system of laws that encourages its citizens to report reasonable suspicions of child abuse. Moreover, Rhode Island law grants immunity to those persons who report their suspicions of abuse in "good faith."

█ To clarify, the "good faith" that confers immunity on an abuse-reporter is different from the "objective good faith" that grants qualified immunity to state officials under 42 U.S.C. § 1983. In the latter case, a court decides whether or not an official has acted with "objective good faith," based solely on the clearly established law at the time that the official acted. The court, and not the finder of fact, makes this determination as a matter of law, and the court does not consider the motives of the state official in its calculus. In contrast, the "good faith" required by the Rhode Island statute that confers immunity is subjective. The "good faith" goes directly to the question of the motivation with which the abuse-reporter acts. Only if an abuse-reporter can prove that he or she had a reasonable suspicion of abuse will he or she be granted immunity from suit. If there is a genuine issue of material fact as to whether the reporter acted in good faith, that question must be decided at trial by the jury.

█ That is not the case here. As the First Circuit held in *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir.1991),

> [o]ver time, summary judgment has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways. Hence, while courts should apply the controlling standards carefully in all cases—and especially in cases that present difficult issues of proof—summary judgment can be appropriately entered even where elusive concepts such as motive or intent are involved. *See, e.g., Medina–Munoz [v. R.J. Reynolds Tobacco Co.]*, 896 F.2d 5, 8 (1st Cir.1990).

In this spirit, this Court now concludes that Marceau's report of abuse was given in good faith. The following undisputed facts are dispositive proof of the reasonableness of Marceau's suspicions: Marceau's invitation to speak in a small group was directed to children concerned about the way in which their parents treated them; Mary voluntarily accepted Marceau's invitation; *in the context of a discussion about serious child abuse,* Mary said that she was hit and bruised; and while she was asked about being hit by her parents, Mary was crying. Those undisputed facts alone render Marceau's suspicion that Mary was being abused eminently reasonable. Though the Wojciks argue that Mary never explained how she was hit or how or why she was bruised, the burden was really on Mary to clarify what she meant. Indeed, if Mary was making those statements in a way that did not relate to the conversation that Marceau was conducting about child abuse in the Wojcik home, her remarks stand out as utter nonsequiturs. It was not Marceau's obligation to untangle this child's cryptic speech. In fact, Marceau could have been accused of breaking the law had she *not* reported her suspicions to the DCF within twenty-four hours, given the content of Mary's speech. *See* R.I.Gen.Laws § 40–11–3(a); *Curtis v. R.I. Dept. for Children and Their Families,* 522 A.2d 203, 206 (R.I.1987).

Therefore, this Court grants Marceau's motion for summary judgment as to every pendent state law claim that arises out of the first incident. Marceau, in making the report to the DCF is immune from suit under R.I.Gen.Laws § 40–11–4 because the report clearly was made in good faith.

### 2. Pendent state law claims as to Carol Costanza

 The same absence of facts that characterized plaintiffs' § 1983 claims against Costanza are also offered to support the various pendent state law claims that name her as a defendant. However, plaintiffs have simply not alleged any wrongdoing of any sort on the part of Costanza, and they have not produced any evidence to prove that Costanza caused any injury. The worst allegation made against Costanza is contained in Mary's deposition. Therein, Costanza is charged with saying during the presentation something like "all slapping of children is abuse." But even if true, the question of how that statement constitutes some sort of state law offense is a mystery that this Court can simply not solve. Therefore, Constanza's motion for summary judgment is granted as to all the state law claims.

### 3. The Rape Crisis Center

 The only remaining defendant to the pendent state law claims associated with the first incident is the Rhode Island Rape Crisis Center. The RCC is essentially involved only because of principles of respondeat superior under state law; it has been charged with the alleged misconduct of Costanza and Marceau, its employees. However, since the Court has already determined that Marceau is immune from suit because her report was made in good faith and Constanza did nothing wrong, and since the Rape Crisis Center is implicated through all counts of the complaint except Count XII only because of the doctrine of respondeat superior, the Court also grants that defendant's motion for summary judgment as to all Counts except Count XII. With respect to Count XII, which alleges that the RCC was negligent in hiring Marceau, the Court grants that defendant's motion on the grounds that Marceau committed no actionable act of negligence.

### II. The Second Reporting incident and the Town Defendants

To refresh, the second incident finds its genesis in the relationship between Katherine and her fourth- and fifth-grade teacher, Leoni. Though the facts are somewhat in dispute, it is apparent that Katherine wrote things in her journal that, either directly or indirectly, led Leoni to call both an attorney and then the DCF to report her suspicions that Katherine was being abused. After receiving a call, the DCF then investigated the Wojciks for child abuse for the second time.

The second incident has more to it than a simple investigation, however. The additional, significant allegations that characterize the second incident are as follows: that Katherine was taken from Halliwell Elemen-

tary School to the North Smithfield Junior–Senior High School; that she travelled in Davidson's car, under the supervision of Davidson and Nault; that she was removed from her school against her will; that she was restrained in the car when she arrived at the Junior–Senior High School; that eventually she was allowed to join her sister Mary; and that both Mary and Katherine were questioned by Richard Cardin, a DCF investigator, at the Junior–Senior High School. Cardin stated that he did not request that Katherine be transported to a different location. Cardin also interviewed the Wojcik parents at the Junior–Senior High School.

This second incident gives rise to twenty counts in plaintiffs' complaint. These remaining counts name the Town defendants in various combinations. As with the counts that pertain to the first incident, plaintiffs' shotgun-style attack is led by Counts I, II and III, which proceed under 42 U.S.C. § 1983. Count I and II allege that "Shunney, Davidson, Smith, Nault, Leoni, Brady, and Mancuso either deliberately acted and/or failed to act in a manner that caused [sic] and subjected Plaintiffs, Wojcik, [sic] to deprivation [sic] of rights and entitlements guaranteed to them by the Constitution and laws of the United States." Plaintiffs' complaint, at ¶ 54. The "rights and entitlements" of which plaintiffs' were deprived are not stated on the face of the complaint. Count III of the complaint, brought by the Wojcik children, names the Town of North Smithfield, the School Committee, the School Committee Members in their individual capacities and the Town's Financial Director as defendants, and alleges that they deprived the Wojcik children of a "free, appropriate public education." By an opinion dated November 6, 1992, this Court issued an order dismissing the School Committee as an improper party and granting the School Committee members' motion to dismiss on the grounds that the complaint failed to state a claim against them. Aside from Counts I through III, the following counts are still alive as to the second incident: VIII (negligence), IX (negligence), X (negligence), XI (negligence), XVI (assault and battery), XVII (false imprisonment), XVIII (false imprisonment), XXI (intentional infliction of emotional distress),

XXII (intentional infliction of emotional distress), XXV (custodial interference), XXVII (civil conspiracy), XXVIII (civil conspiracy), XXIX (punitive damages), XXX (punitive damages), and XXXII (injunctive relief).

## A. 42 U.S.C. Section 1983 Claims.

After hearing oral argument on the Town defendants' motion for summary judgment, Judge Lovegreen recommended that their motion as to Counts I, II, and III be granted, but only to the extent that the Complaint alleged a deprivation of the constitutional right to familial integrity. Judge Lovegreen also recommended that defendants' motion as to the pendent state law claims be denied, since the outcome turned on the factual question of whether defendants had acted in good faith pursuant to R.I.Gen.Laws § 40–11–4.

Plaintiffs have objected to the Judge Lovegreen's Report for two reasons. First, they claim that the Report is in error insofar as it grants summary judgment on principles of qualified immunity, since none of the Town defendants are entitled *to raise* that affirmative defense. Second, as they did earlier, plaintiffs object to the finding that the right to familial integrity is not clearly established. This second argument was considered *ante*, and this Court now restates its unequivocal holding that the constitutional right to familial integrity is not clearly established law. Thus, only plaintiffs' first objection—the question of whether the Town defendants may indeed raise immunity—will be considered.

### 1. The School Personnel

■ The basis for plaintiffs' argument that the school personnel cannot *raise* the affirmative defense of qualified immunity concerns the scope of authority with which the school personnel took actions toward the Wojcik children. Essentially, plaintiffs contend that the school personnel so recklessly exceeded the authority that they could lawfully exercise that they ceased to be state actors, and were rather private actors acting under color of state law. As private actors, plaintiffs argue, the school personnel should not be allowed to raise the defense of quali-

fied immunity. Plaintiffs cite *Rodriques v. Furtado*, 950 F.2d 805 (1st Cir.1991), and *Felix de Santana v. Velez*, 956 F.2d 16 (1st Cir.1992), as support for their position.

Plaintiffs' reliance on that case law is misplaced. In *Rodriques*, the First Circuit considered the question of whether a doctor who performed a vaginal search pursuant to a court order could raise the defense of qualified immunity. In finding that the doctor *could* raise an immunity defense, the Court relied on both the doctor's compliance with a court order and the doctor's cooperation with officials of the state. 950 F.2d at 812. In *Velez*, the First Circuit reviewed a district court's decision denying two defendants the opportunity to raise the defense of qualified immunity. In upholding the district court, the First Circuit supported the district court's reliance on the following criteria: (1) whether the defendants had raised public policy arguments to justify immunity; (2) whether defendants cooperated with any public authority; (3) whether defendants had relied on a statute to justify their conduct; and (4) whether § 1983 exposure would disrupt the normal performance of defendants' duties. 956 F.2d at 19. Plaintiffs argue that *Rodriques* and *Velez* stand for the proposition that private actors who act "on their own initiative and not at the behest of the state" are not entitled to raise the defense of qualified immunity.

This interpretation overstates the holding of those cases. In reaching the decisions in both *Rodriques* and *Velez* to allow or disallow the defendants to raise qualified immunity, the district courts relied on a variety of factors, of which cooperation with a state official was only one. These decisions do not hold that "action at the behest of the state" is the linchpin to raising immunity. What *Rodriques* and *Velez* do hold is that when qualified immunity is raised by a private individual, that it must be scrutinized on a case by case basis and in light of the four criteria referenced in *Velez* and stated *supra*.

Even if this Court were to agree with plaintiffs' interpretation of *Rodriques* and *Velez*, the holdings of those cases are inapposite to the case at bar. Unlike the defendants in *Rodriques* and *Velez*, the school

officials here were not private citizens who cooperated with a state investigation or action, nor were they private actors who acted by mandate of the state. Rather, they were state actors from the start. They were employees of the North Smithfield School system, and they took actions with respect to the Wojcik children as school personnel. They brought Katherine to the Junior–Senior High School in an attempt to effectively aid the DCF, and the suspicions of abuse were reported in an effort to comply with legally mandated duties. In taking both actions, the school employees needed to exercise discretion of the type that the Supreme Court intended to protect with the doctrine of qualified immunity in *Harlow v. Fitzgerald*, *supra*, and in *Lugar v. Edmondson*, *supra*. While their actions may not have been entirely proper, they still committed the acts within the scope of their official duties. As a result, this Court holds that they are entitled to raise the defense of qualified immunity, since they never acted as private persons with respect to the Wojcik children.

Public policy considerations also support the determination to allow the school personnel to raise qualified immunity. If school officials, particularly of the kind that took action with respect to the Wojciks, are saddled with the fear of exposure to liability under § 1983, then the reporting of legitimate cases of abuse to the DCF could be curtailed, to the detriment of children around the state. Such a result would stand in stark contrast to the legislative enactments of Rhode Island, which make it mandatory that reasonable suspicions of abuse be reported. Thus, public policy requires that the school employees be permitted to raise qualified immunity in cases of this kind.

At this point, however, the Court emphasizes that the Town defendants are only immune from violations of rights and laws that are *not clearly established*. For violations of clearly established law, the Town defendants are still liable. Thus, to the extent that plaintiffs' claims are based on a violation of the right to familial integrity, this Court now grants summary judgment as to Counts I and II. And further, to the extent that Counts I and II seek redress for any injuries

arising out of the *first* incident, defendants' motion for summary judgment is granted.

■ Counts I and II are not entirely without merit, however. There are facts that breathe life into what remains of those Counts. The life comes from the actions that Davidson and Nault took with respect to Katherine in transporting her from the Halliwell Elementary School to the North Smithfield Junior–Senior High School.

In so doing, Davidson, Nault, and any other person involved in moving Katherine from her school to the Junior–Senior High School may have infringed Katherine's constitutional right to be free from unauthorized seizures of her person. *See* U.S. Const. amend. IV. It is incontrovertible that individuals have a right to be free from unreasonable search or seizures. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Thus, to the extent that Katherine seeks redress for the seizure of her person, defendants' motion for summary judgment as to Counts I and II is denied.

### 2. The Town of North Smithfield

■ Proceedings brought against the Town of North Smithfield are necessarily different from those brought against the school personnel because the Town is a municipality. Unlike state actors or private individuals charged with a deprivation of rights, a municipality is not entitled to claim qualified immunity, even for violation of rights that are not clearly established. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* — U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Owen v. City of Independence,* 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d 850 (1980). Thus, the Town of North Smithfield is not qualifiedly immune from suit in this case.

■ However, the cause of action brought against a municipality is also different from the one brought against the school personnel. A municipality can only be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. N.Y. City Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611, 638 (1978). Consequently, plaintiffs have the burden of proving that North Smithfield's official policies caused them injury.

A § 1983 challenge brought against the Town of North Smithfield may not proceed under a theory of respondeat superior. The Supreme Court made this holding perfectly clear in *Monell* wherein it held

> [t]he language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.

436 U.S. at 691, 98 S.Ct. at 2036. This ruling has been followed assiduously by the courts of the First Circuit. *See, e.g., Lyons v. National Car Rental Systems, Inc.,* 30 F.3d 240 (1st Cir.1994).

■ Plaintiffs' allegations against the Town fail because they have designed their case in a way that proceeds under a theory of respondeat superior. Plaintiffs have produced no evidence that establishes that the Town of North Smithfield maintained an official policy that in any way caused the Wojciks injury. In addition, they have charged the Town's financial director with no action that could be considered a policy that resulted in injury to the Wojciks. The only way that the Town is involved is through the actions of the school employees. But as the Supreme Court has unequivocally held in *Monell* and *Leatherman,* that is not an appropriate basis for liability under § 1983.

The injury about which plaintiffs complain in Count III also demonstrates that the plaintiffs are proceeding under a respondeat superior theory. Plaintiffs claim that they

were denied a "free, appropriate education" in the North Smithfield School system. Notwithstanding that the facts show no such deprivation, plaintiffs have not produced any evidence that suggests that the Town maintained any official policy that caused such deprivation. The claimed deprivation only results from the actions taken by the school personnel. Absent such a causal relationship between an official policy and a claimed injury, plaintiffs' claim against the Town of North Smithfield necessarily fails.

Therefore, this Court grants the Town's motion for summary judgment as to Count III.

### 3. The Financial Director of the Town of North Smithfield

Count III of plaintiffs' complaint names Henrietta Delage, the Financial Director of the Town of North Smithfield, as a defendant in a cause of action brought under § 1983. However, plaintiffs' complaint is devoid of facts to support this claim. Since plaintiffs have alleged no facts, supervisory or otherwise, that would expose the Financial Director to liability, the Count against Delage necessarily fails. As the First Circuit has stated, § 1983 complaints require a satisfactory factual pleading to survive:

> We require more than conclusions of subjective characterizations. We have insisted on at least the allegation of minimal factual setting. It is not enough to allege a general scenario which could be dominated by unpleaded facts....

*Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir.1982), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983). Plaintiffs' have simply not supported their claim in pleading or in response to defendants' motion.

Therefore, the Court grants Delage's motion for summary judgment as to Count III.

### B. Pendent State Law Claims

There are seventeen state law claims that remain as to the second incident. The Town defendants have moved for summary judgment with respect to all of these Counts by arguing that they are immune from suit under R.I.Gen.Laws § 40–11–4. As noted previously, that statute grants immunity to all those who participate in making a good faith report of child abuse to the DCF. Defendants contend that they are covered by the statute, since Leoni and Davidson were required by law to notify the DCF of the information that they received from Katherine through her journal.

Whether or not Leoni and Davidson acted in good faith in reporting the abuse to the DCF is a question of fact. If there is a conflict as to a genuine issue of material fact, the Court is bound to refrain from deciding such a question on a motion for summary judgment. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990). Such conflicts must be ultimately resolved by the finder of fact at trial. In this case, there is a genuine issue of material fact as to whether Leoni, Davidson and Nault acted in good faith at all times during the second incident.

Specifically, there remain questions of material fact surrounding the details of Katherine's entries in her journal. Though the journal's contents have been reviewed by the Court, Katherine claims that she was the only student in her class to keep a journal and that Leoni told her to write down "only the bad things." Katherine also states that she never was asked if any of these entries were truthful. Leoni denies these allegations. Leoni also stated in her deposition that she did not believe that Katherine was being abused, but that she was "concerned," and that she never witnessed any signs of bruising on Katherine that would suggest abuse. These conflicting stories create a question as to whether Leoni had reasonable suspicions of abuse and if her decision to report was indeed done in good faith. Further, there is a genuine issue of material fact as to whether Davidson and Nault's conduct was sufficiently proximate to the report of abuse that they could be considered "participants" under the terms of the statute and as to whether their actions in transporting Katherine to the Junior–Senior High School were done in good faith.

Since resolution of these questions would require the Court to choose between plaintiffs' and defendants' versions of the facts,

they are inappropriately resolved on a motion for summary judgment. Therefore, the Court denies the Town defendants' motion for summary judgment as to all state law claims that arise out of the second incident. The Court refrains from considering the merits of the claims contained in plaintiffs state law case in-chief against the Town defendants, because the validity of the state law claims is not appropriately before the Court at this time, given the design of the Town defendants underlying motion for summary judgment.

## V. *Conclusion*

The Court hereby grants summary judgment as to the following portions of plaintiffs' complaint: Counts I & II, to the extent that they claim deprivations of the right to familial integrity; Count III; Count IV; Count V; Count VI; Count VII; Counts X & XI, to the extent that they name the RCC, Marceau and Costanza as defendants; Count XII; Count XIV; Count XVII, to the extent that it names the RCC, Marceau and Costanza as defendants; Count XIX; Count XX; Count XXIII; Count XXIV (misnumbered as Count XVI in the complaint); and Counts XXV, XXVII, XXVIII, XXIX, and XXX, to the extent that they name the RCC, Marceau, and Costanza as defendants. Moreover, Counts XV, XVII, and XXXI, as well as Count XXVI, to the extent that it names the RCC, Marceau and Costanza, are no longer

before this Court, as they were voluntarily dropped by plaintiffs on December 27, 1993.[4]

It is so ordered.

---

4. The Counts that remain in this case are: Counts I & II, brought respectively by the parents and the children under § 1983, to the extent that they do not claim a deprivation of the right to familial integrity; Counts VIII & IX, brought respectively by the parents and children and alleging negligence, to the extent that they name the Town, the School Committee members, and Delage; Counts X & XI, brought respectively by the parents and the children and alleging negligence, to the extent that they do not name the RCC, Marceau, Constanza, and the School Committee; Count XIII, brought by the parents and alleging negligence, to the extent that it names the Town; Count XVI, brought by the children and alleging assault and battery; Count XVIII, brought by the children and alleging false imprisonment, to the extent that it does not name the School Committee and its members; Count XXI & XXII, brought respectively by the parents and the children and alleging intentional infliction of emotional distress, to the extent that they do not name the School Committee and its members; Count XXV, brought by the parents and alleging custodial interference, to the extent that it does not name the RCC, Marceau, Costanza, the School Committee, and the School Committee members; Count XXVI, brought by the parents and alleging unlawful abduction, to the extent that it does not name the RCC, Marceau, Costanza, the School Committee, and the School Committee members; Count XXVII & XXVIII, brought respectively by the parents and children and alleging civil conspiracy, to the extent that it does not name RCC, Marceau, Costanza, the School Committee, and the School Committee members; Counts XXIX & XXX, brought respectively by the parents and children, to the extent that they do not name the RCC, Marceau, Costanza and the School Committee; and Count XXXII, brought by the parents and requesting injunctive relief, to the extent that it names the Town and the School Committee members.