62 F.Supp.2d 519 (1999)
Lorena STRAIL, individually and on behalf of Sarah STRAIL, and Richard Mello, individually and on behalf of Natalia Mello, Plaintiffs,
v.
DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES OF the STATE OF RHODE ISLAND, Marge Renzi, and Pat Morgan, individually and in their capacities as agents of the Department of Children, Youth, and Families of the State of Rhode Island, Defendants,
No. C.A. 98-105L.
United States District Court, D. Rhode Island.
August 23, 1999.
*520 Joseph R. Palumbo, Jr., Palumbo, Galvin & Boyle, Middletown, RI, for plaintiffs.
James R. Lee, Attorney General's Office, Providence, RI, for defendants.

OPINION AND ORDER
LAGUEUX, Chief Judge.
Plaintiffs Richard Mello and Lorena Strail were living together with their respective children, Natalia Mello and Sarah Strail, on October 10, 1996 when an officer of the Rhode Island Department of Children, Youth, and Families ("DCYF") removed Natalia from their home. Richard and Lorena were likewise living together on October 30, 1996 when DCYF removed Sarah from Lorena's custody. Both of these removals were temporary and were later confirmed by timely and appropriate orders from the Rhode Island Family Court. In both of these instances, however, Richard and Lorena argue that the initial removals were not based on reasonable suspicion of child abuse or neglect. As a result, plaintiffs argue that the removals violated their substantive due process rights to the care, custody, and management of their children. They seek damages under 42 U.S.C. § 1983 from DCYF and individual case agents, Marge Renzi and Pat Morgan, in order to remedy the constitutional violations. In response to these allegations, defendants seek summary judgment by attempting to shield themselves with the often impenetrable defense *521 of qualified immunity. For the reasons stated below, the defendants' motion for summary judgment is granted in part and denied in part.

BACKGROUND
On a motion for summary judgment, the court must view all evidence and related reasonable inferences in the light most favorable to the nonmoving party. See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd., 133 F.3d 103, 106 (1st Cir.1997). The following factual recital is constructed with that rule of law in mind.
Richard Mello, a widower, was the sole care giver for his adopted daughter, Natalia Mello, when he met Lorena Strail in January 1995. Lorena likewise had a daughter, Sarah, when she met Richard. The four began living together as a family in July 1995.
By October 1996, Richard had been participating for some time in therapy for a sexual addiction. Richard was also a recovering alcoholic. The record provides only cursory insight into the extent of Richard's sexual addiction. However, this much is clear: he was fond, and arguably obsessed, with adult pornography. In particular, according to Richard, he spent a substantial amount of time looking at adult pornography on his computer via the Internet. However, there has never been any allegation in this case that Richard's interests included child pornography.
On the morning of October 10, 1996, Lorena and Richard were involved in an argument. The dispute arose when Lorena discovered Richard with a pornographic magazine featuring older women. She claimed that she had never before seen Richard with a pornographic magazine. But she felt that even this instance was inappropriate and threatened to leave him. Richard explained that the argument, which ended in a drinking binge after twenty months of sobriety, involved Lorena's complaint that he was spending too much time alone viewing adult pornography on his computer and not enough time with the family. Lorena believes that it was her threat of leaving Richard that induced him to begin drinking.
The children were not present during this argument, nor were they present when Richard began drinking earlier that day. According to Lorena, after Richard finished an entire quart of vodka, his face grew red and his movements wobbly. Lorena became worried and decided to call Richard's therapist. Unable to get in touch with the therapist, Lorena determined to call her own therapist for help. She reached her therapist, Enid Flaherty, at approximately 1:30 in the afternoon. She told Flaherty that Richard was drinking and that he might have also taken Prozac. Lorena also believed that Richard had not been taking his prescribed dosage of Antabuse for a week, but had started taking it again that day. The therapist suggested that Lorena call an ambulance.
At approximately 2:00 in the afternoon, the police arrived with the paramedics. Richard was playing music and, according to Lorena, "was sort of hyper." As the paramedics attended to Richard, checking his blood pressure and placing him on a stretcher, Lorena's attention was focused on answering the police officers' questions. She spoke with the officers for more than a half-hour. In that time, Lorena explained that she and Richard had an argument earlier that day and that Richard had been drinking. She described the argument as revolving around a men's magazine containing nude pictures of older women. Lorena admitted that she had threatened to leave Richard and that this threat may have led to his drinking. She also suggested to the police that Richard may have stopped taking his Antabuse that week.
Before the police left, Lorena filled out a witness statement. Though Lorena now says that she did not believe everything she wrote in the statement and that she felt pressured by the police to write it, the statement is important to this inquiry because *522 of the likelihood that the police relayed its contents to DCYF officials when the police called the child abuse hotline later that day. The statement reads as follows:
On 10-10-96 Richard Mello & I quarreled [sic] because I am moving out and because of recent arguments. Richard began drinking at 12 pm. Vodka, he told me that he took some valiums and prozac and to "please call 911 if I fall down and stop breathing." He continued to drink until the vodka was gone. Then he refrigerated some beers he started banging on the glass doors and screaming. Playing blues music really loud and would not turn it down. He was acting very belligerent. I called unsucessfully 3 times to Richard's therapist. So I called mine Enid Flaherty. She told me to call rescue immediately. Currently we have 2 children. One Sarah Strail my biological daughter 7, and Natalia Mello 5 Richard's adopted 5 year old daughter. I am afraid that Richard may harm himself or me. Neglect Natalia if I leave. Or harm her. Or Sarah. Richard cannot drink if he is going to raise Natalia he is not capable of it.
The statement was taken at 2:07 p.m. and the police left the house at 2:30 p.m.
While the police spoke to Lorena, the paramedics took Richard to Newport Hospital. Richard left the hospital that same day against the advice of the police. Later that night, a Portsmouth Police officer arrested Richard at Island Park for disorderly conduct. Richard was held at the station overnight. Between 9:00 p.m. and 10:00 p.m. that night, Lorena called the Portsmouth Police station and spoke with Richard. Richard told her that he was sorry for everything that had happened and that they would work things out later. They agreed that Lorena would meet him at the courthouse the next morning, ending the conversation on good terms.
Sometime prior to the DCYF agent's arrival at her house that night, Lorena, under the advice of the police, called the DCYF hotline. On the hotline, Lorena explained that she and Richard had an argument that night. She described how the argument began and mentioned that the hotline phone call was made at the suggestion of the police officers who responded to her initial call for help. She does not remember what else she said during that phone call.
Lorena's call was the second received by the hotline that day regarding plaintiffs' household. The Portsmouth Police made the first call. Marge Renzi, the DCYF official assigned to investigate the incident that evening, noted that the police told the hotline that Richard was mixing Prozac, Valium, and Vodka that day. The police warned Renzi that the incident was a suicide attempt, inspired by Lorena's threat of leaving Richard.
Sometime between 11:00 p.m. and 11:30 p.m., Renzi knocked on Lorena's door. Renzi reported that Lorena was frightened when she answered. Lorena explained that she was afraid because she thought it was Richard returning home. Lorena assured Renzi that Richard was not abusive to her, but she did express some concern that she was unsure of what Richard might do. According to Renzi, Lorena said that Richard was "out of control" that night because of his certain ingestion of vodka and probable ingestion of several narcotics. This is how Renzi reported her initial contact with Lorena. Nothing in Lorena's deposition contradicts this version of events.
At her deposition, Lorena asserted that the following happened when Renzi arrived at her home. The DCYF agent began by introducing herself and explaining that she was there to investigate allegations of child abuse. After the introduction, Lorena answered Renzi's questions. Lorena told Renzi that Richard had once slapped Sarah in the face and that this was the only time she had ever seen Richard strike either child. Renzi asked Lorena to *523 search Richard's computer files for pornography. All she found was a scanned image of a doll. Renzi later found an old soft-body doll with a plastic head and limbs. The doll, described as "doll in bondage," had a band-aid over its mouth and its hands tied together. Lorena explained that Richard created it for a "politically incorrect" contest at school. Despite her search, Renzi found no pornography in the house. Lorena also said at her deposition that she told Renzi that Richard's taste in pornography gravitated towards older women. She explained that the magazine that sparked the incident featured women from the ages of fifty to eighty.
Renzi also asked Lorena about a photograph taken of Sarah. According to Lorena, Renzi learned of this photograph from Richard's therapist approximately eight months prior to the day in question when the therapist called DCYF's hotline with concerns about Richard. Lorena explained that the picture of Sarah, similar to one taken of Natalia, showed the girl with her shirt wrapped around her waist and her hands covering her breasts. Richard also took a picture of Lorena in a similar pose, but only her head was featured in the final print.
According to Lorena, Renzi then asked if she could see the children. Lorena explained that the children were sleeping, but agreed to allow Renzi to see them. Sometime prior to waking the children, however, Lorena told Renzi that Richard was a member of both Sex and Love Addicts Anonymous and Alcoholics Anonymous. Lorena also admitted that Richard sneaks onto the Internet to view pornography whenever possible. However, she did not believe that this pornography ever included child pornography. Lorena confided that Richard's Internet activities were taking him away from his family activities. Lorena was unable to further articulate what these pornographic activities were because she insisted that Richard conducts them in private. She did note, however, that Richard spent approximately six hours a day at his computer in a room near the family kitchen.
After entering the children's room, Renzi inspected their bodies and genitals. According to Lorena, Renzi then asked her to take Natalia out of the room so that she could speak to Sarah alone, although Lorena was able to hear Sarah and Renzi through the door. Sarah was seven years old at the time. Lorena heard Renzi ask Sarah about "good touches" and "bad touches" and heard Sarah explain that she did not understand. Eventually, she heard Sarah say that she had received a bad touch on her face. According to Renzi, Sarah said that Richard slapped her once on the arm and once on the face. Lorena also heard Sarah say that she saw "yucky stuff" on Richard's computer. Sarah called what she saw "pink squishy pumpkins." According to Lorena, she also heard Renzi asking about "naked ladies?" Lorena did not hear the remainder of the conversation. After questioning Sarah, Renzi asked Natalia several questions, but Natalia, who was five years old, was unable or unwilling to answer the questions.
Although Lorena was aware that Sarah had seen "yucky stuff' on the computer, she explained at her deposition that she believed this to be an innocent picture created by Richard of Lorena's ears using a digital scanner. Sarah had previously described this picture to Lorena as "yucky." Lorena denied that Sarah had ever been exposed to pornography on the computer.
After making some phone calls, Renzi informed Lorena that her superior ordered her to remove Natalia from the home. Renzi discovered that Richard's brother, John Mello, lived in Woonsocket, Rhode Island and she decided to place Natalia in his custody temporarily. Renzi also told Lorena that if she did not take Sarah out of the house that night, DCYF would take custody of Sarah as well. Consequently, Lorena talked with John Mello who agreed *524 to allow Lorena and Sarah to stay with him.
Subsequently, DCYF obtained a verbal ex parte order of detention from the Rhode Island Family Court on October 11, 1996 for Natalia's removal. See R.I.Gen. Laws § 40-11-7.1(a) (permitting the Family Court to issue ex parte orders of detention "for the protection of the child"). On October 15, 1996, Associate Justice Kathleen A. Voccola of the Family Court issued a written order of detention placing Natalia in the "temporary custody of DCYF." Following a probable cause hearing, Justice Voccola issued another detention order on October 23, 1996.
During her stay at John Mello's home, Lorena spoke by telephone with a DCYF social worker, Crishna Faulk. Lorena asked Faulk if she and Sarah could return to their home. Faulk replied that they first had to attend a Family Court probable cause hearing related to Natalia's custody status. After the probable cause hearing on October 23, 1996, Lorena spoke again with Faulk in order to arrange a visit between Richard and Natalia. The reunion took place without a hitch. Significantly, Lorena also contends that Faulk told her that she and her daughter could return home, even though Richard was living at their home.
Relying on the advice of Faulk and her attorney, Lorena brought Sarah home sometime prior to Halloween; the child had been living with Lorena's mother in New York while Lorena attended to the court proceedings. On her first day back in school, Sarah's guidance counselor asked her about Richard. It is unclear from the record what information the guidance counselor learned from Sarah. It is also unclear from the record who called the hotline on October 30, 1996 to notify DCYF that Richard was again living in the home with Lorena and Sarah. It is clear, however, that at some point Sarah's guidance counselor conveyed this information to DCYF.
On the evening of October 30, 1996, Pat Morgan, a DCYF agent, visited plaintiffs' home. According to Lorena, Morgan explained that she intended to take Sarah into state custody. Richard was not home when Morgan arrived, but when Richard returned from the video store, Morgan told Lorena that she "knew this was going to happen." According to Lorena, Morgan also told Lorena that "it" was what she deserved.
Morgan and the police denied Richard the opportunity to call his lawyer before they left with Sarah. Morgan explained that Lorena's return to the home prompted DCYF's action. Lorena argued that neither the Family Court nor DCYF had ever ordered her not to live with Richard. She explained that she thought Renzi's original order to vacate her home applied only to the night of the original incident and that Faulk sanctioned her return.
Defendants do not agree entirely with the foregoing version of the facts. The following details, culled from Renzi's official reports for DCYF differ in several respects from the facts as presented by plaintiffs. Renzi noted in her summary of the case that Lorena told her that Richard was obsessed with many types of pornography. Further, she told Renzi that the phone company blocked the placement of "900" calls from their phone due to the bill Richard racked up on his deceased wife's account. Lorena lamented that Richard's sex problems had escalated to point where he was neglecting his duties as a father and mate.
Renzi reported that Sarah admitted to seeing Richard at his computer looking at "stuff, gross stuff, squished pumpkins, everything that's gross, it makes me feel yucky." According to Renzi, during her initial conversation with the child, Sarah continued to describe what she saw as "all pink, slime all over a person, a lady, no clothes on." Based on this description, Renzi assumed that Sarah had been exposed to pornography. Sarah further explained that "it happens a lot" and that her *525 mother told her not to worry about it. Renzi further recorded that when Lorena confronted Richard.
Defendants assert that on October 30 1996, DCYF received a phone call informing the agency that Richard was again living with Lorena and Sarah. Defendants claim that during a private conversation with Morgan, Sarah admitted that she had been instructed by her mother to lie about Richard living in the house. Sarah feared that she would be taken from the home if this information were discovered. When confronted with this, Lorena argued that she believed it proper to allow Richard to stay at home and that she was only advised by DCYF to keep pornographic materials away from her daughter. Her arguments were to no avail. Morgan placed Sarah in protective custody that night. See R.I.Gen.Laws § 40-11-5(d) (permitting DCYF to place a child in protective custody for forty-eight hours without first obtaining a court order). On November 1, 1996, Associate Justice Peter Palombo, Jr. of the Family Court issued an order of detention for Sarah.
On February 9, 1997, the Family Court dismissed all charges lodged against plaintiffs. After reuniting, the family commenced this litigation in which each parent sues on his and her own behalf as well as on behalf of the children. The Complaint contains two counts. In Count I, plaintiffs seek compensation for the allegedly unconstitutional removals of the children. Defendants counter with a motion for summary judgment on Count I. However, defendants do not offer a summary judgement motion on Count II, which alleges a state-law claim for negligence by DCYF in placing Sarah in a foster home where she allegedly was molested. Consequently, the Court will only deal with Count I. At issue is whether the temporary separations of the two children from their respective parents rise to the level of actionable deprivations of the family's constitutional rights. This Court is concerned only with the removal of the children for the limited period until DCYF obtained valid Family Court orders of detention.

DISCUSSION

I. Standard of Review
Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a motion for summary judgment:
The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
Fed.R.Civ.P. 56(c). Therefore, the critical inquiry is whether a genuine issue of material fact exists. "Material facts are those `that might affect the outcome of the suit under the governing law.'" Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir.1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine `if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248, 106 S.Ct. 2505).
On a motion for summary judgment, the Court must view all evidence and related reasonable inferences in the light most favorable to the nonmoving party. See Springfield Terminal Ry. Co., 133 F.3d at 106. "Summary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." Gannon v. Narragansett Elec. Co., 777 F.Supp. 167, 169 (D.R.I.1991).

II. Standards of Law

A. Claims under section 1983
In order to sustain a cause of action under 42 U.S.C. § 1983, plaintiffs must establish two essential elements. *526 First, plaintiffs must demonstrate that the conduct complained of was committed by a person acting under color of state law. See Frazier v. Bailey, 957 F.2d 920, 928 (1st Cir.1992). Second, plaintiffs must show that this conduct deprived them of rights, privileges, or immunities secured by the Constitution or laws of the United States. See Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 559 (1st Cir.1989). In this case, plaintiffs assert that defendants acted under color of state law and that their actions violated plaintiffs' constitutional rights to familial association, familial integrity, and the care, custody, and management of their children.
It is undisputed that the conduct complained of was committed by persons acting under color of state law. Renzi and Morgan, DCYF agents, were both state officials acting in their official capacities at the time of the removals in question. That issue requires no further analysis. What does warrant further inquiry is whether the conduct complained of deprived plaintiffs of any rights secured by the Constitution or laws of the United States.

B. Constitutional parameters
If it is not already self-evident, the United States Supreme Court has made it abundantly clear that "[t]he intangible fibers that connect parent and child .... are sufficiently vital to merit constitutional protection in appropriate cases." Lehr v. Robertson, 463 U.S. 248, 255, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). These "intangible fibers" find their protection in the substantive component of the Due Process Clause of the Fourteenth Amendment. Id. at 256-57, 103 S.Ct. 2985; cf. Hermanowski v. Farquharson, 39 F.Supp.2d 148, 156 (D.R.I.1999) (distinguishing between substantive and procedural due process). Indeed, the constitutionally-protected relationship between parent and child has found safe harbor in Supreme Court decisions on numerous occasions. See Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (tracing the Court's jurisprudence). Consequently, the broad area of constitutional rights protecting the parent-child relationship enjoys a rich history. At this time, however, this Court will only concern itself with the rights of familial association and familial integrity as they relate to the facts of the present case.
Many courts have acknowledged the constitutional right to familial association. See Pittsley v. Warish, 927 F.2d 3, 8 (1st Cir.1991) (discussing many cases). The First Circuit, like most courts which have recognized a protected right to familial association, has resisted doing so except "where the plaintiffs have alleged a permanent, physical loss of association of an immediate family member as a result of unlawful state action." Id. at 7. In the case sub judice, although plaintiffs allege two physical removals of immediate family members, these separations cannot, by any stretch of the legal imagination, be viewed as permanent. Therefore, neither loss amounts to a violation of plaintiffs' rights to familial association.
Although the right to familial association only finds protection when the loss is a permanent one, the Supreme Court has afforded protection against temporary deprivations in the parent-child relationship as part of the right to familial integrity. The Supreme Court has long recognized the importance of maintaining the integrity of the family. See Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). In particular, "[t]he rights to conceive and to raise one's children have been deemed `essential.'" Id. (quoting Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). A First Circuit panel has explained that the Supreme Court recognizes a liberty interest in "familial integrity" that is fundamental; yet it remains abstract. Frazier, 957 F.2d at 929 (discussing Stanley, 405 U.S. at 651, 92 S.Ct. 1208, Prince v. Massachusetts, 321 U.S. 158, 165-66, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and Meyer, 262 U.S. at 399, 43 S.Ct. 625).
*527 Although the right to familial integrity is abstract and fundamental in terms of its broad application, this Court has established that, within the general right to familial integrity, there is a more specific liberty interest in a parent's control, custody and care of his or her children. See Wojcik v. Town of North Smithfield, 874 F.Supp. 508, 520 (D.R.I.1995). This Court has warned that the Constitution will not tolerate abusive removals of children from their parents: "it would ... assuredly [offend the constitution] if children were taken away from their parents without due process." Id. However, both this Court and the First Circuit have "never recognized the right to familial integrity as absolute or unqualified." Frazier, 957 F.2d at 929 (citing Lehr, 463 U.S. at 256, 103 S.Ct. 2985); see Wojcik, 874 F.Supp. at 520. The next appropriate step for this Court, then, is to find where the constitutional line has been drawn.
One's interest in maintaining the integrity of one's own family may be limited by a compelling governmental interest in the protection of the children. See Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997); Charron v. Picano, 811 F.Supp. 768, 774 (D.R.I.1993). Several Circuit Courts have identified the point at which the state's interest in protecting a child becomes so great as to warrant removal prior to a court order. Where an objectively reasonable basis exists for believing that parental custody constitutes a threat to a child's health or safety, the Second Circuit has held that "government officials may remove a child from his or her parents' custody at least pending investigation." Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir.1996).
In Gottlieb, a social worker insisted that a father be separated from his two children, particularly his daughter Dawn, pending further investigation of child abuse. See id. at 515. Rather than see his children taken from their home, the father decided to leave. See id. The government later dismissed the complaints against the parents. See id. The parents then brought suit for the temporary separation caused by the state agency. See id. at 516. The Court of Appeals affirmed the district court's granting of summary judgment in favor of the defendants. See id. The Court ruled that there was "no genuine dispute as to what Dawn told [the social worker]." Id. at 519. Dawn told the social worker that "on three occasions in the dark in her room, her father had inserted and moved his finger inside her vaginal area." Id. at 515. These statements "plainly provided an objectively reasonable basis for [the social worker] to believe that [the father] and Dawn should be separated, at least pending further investigation." Id. at 519.
Gottlieb, then, makes it clear that, within certain boundaries, a state removal of a child will rarely constitute a violation of due process rights. Plainly, when there is no dispute regarding the information conveyed to a state agent, and when that information makes it clear that actual abuse has occurred, especially when articulated by the child herself, then the state agency has an objectively reasonable basis for believing that a separation of parent and child is warranted. Such a removal will seldom, if ever, be deemed unconstitutional.
The Third Circuit similarly focused its attention on whether the information available to government agents would justify a forced separation of parent and child. See Croft, 103 F.3d at 1125. The Court has explained that the key test "is whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying" the interference with parental rights. Id. at 1126. In Croft, an anonymous caller provided the social worker with a tip that Dr. Croft was abusing his child. See id. at 1124. Based on the informer's accusations of sexual abuse, Dr. Croft was told by the child welfare agency to leave his home or his daughter, Chynna, would be placed in *528 foster care. See id. Dr. Croft complied, leaving behind his home, wife, and daughter. See id. at 1125. However, he eventually sued the child welfare agency, alleging that it had interfered with his right to companionship with his daughter. See id. The Court of Appeals ruled that the social worker was not "entitled to rely on the unknown credibility of an anonymous informant unless she could corroborate the information" to reduce the likelihood that it was incorrect. Id. at 1126. No other evidence confirmed the bare allegations of the tip. See id. Consequently, the Court ruled that the separation of Chynna from her father amounted to an abuse of power. See id. The Court warned that the "state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Id.
A clear distinction, therefore, exists between Croft and Gottlieb. In Gottlieb, the information not only came from the child herself, but its significance could not have been more clear: "on three occasions in the dark in her room, her father had inserted and moved his finger inside her vaginal area." The source in that case was a credible and immediate one; moreover, the information conveyed was clear, undisputed and demanded immediate separation of parent and child. In Craft, on the other hand, because the credibility of the information made available to the social worker via an anonymous tip had not been corroborated by other sources, the Court ruled that it was not reasonable to rely on such information in order to justify a removal. This case falls somewhere between these two extremes.
This Court has viewed the issue in a similar light. Judge Ernest C. Torres noted in a case raising similar issues that state officials may not remove children from their homes "with impunity." Charron, 811 F.Supp. at 774. The Charron decision, however, did explain that the "State's interest is especially compelling and the parents' right to preservation of the family unit is correspondingly less clear in a situation where there is good reason to suspect that child abuse has occurred." Id. at 773. Accordingly, "when there is substantial cause to believe that child abuse has occurred, the boundaries of parental rights may become so blurred that state officials cannot reasonably be expected to know the precise parameters of those rights." Id.
In Charron, the plaintiff sued DCYF for a violation of the family's liberty interest when their child was removed from their home pending a child abuse investigation. See id. at 770-71. The record clearly stated that the child's doctor submitted a report to DCYF indicating probable child abuse by the parents. See id. at 770. Following this report, DCYF learned from two of the plaintiff's children that their father once hit his son, punched a hole through a closet door, and continued striking his son until he was no longer able to sit down. See id. Based on these undisputed facts, the Court concluded that there was substantial cause to believe that child abuse occurred such that the state officials involved were justified in taking the child into custody. See id. at 774.
As these cases demonstrate, the right to familial integrity is assuredly not absolute or unqualified. The right does not include the right to be free from child abuse investigations. See Watterson v. Page, 987 F.2d 1, 8-9 (1st Cir.1993). Furthermore, this right can, at times, appear abstract in its broad application. See id. at 8. It is not, however, this Court's role to determine the broad applications of this right or to speculate about what state actions short of a removal might amount to a violation of the right. It is enough to recognize that, within the generalized right to familial integrity, there exists a fundamental liberty interest in the care, custody and management of one's children. See Wojcik, 874 F.Supp. at 520; see also Stanley, 405 U.S. at 651, 92 S.Ct. 1208; Croft, 103 F.3d at *529 1125; Gottlieb, 84 F.3d at 518; Cecere v. City of New York, 967 F.2d 826, 829 (2d Cir.1992); Robison v. Via, 821 F.2d 913, 921 (2d Cir.1987); Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir.1977). Specifically, as stated above, the due process clause will certainly be offended if children are taken away from their parents without sufficient investigation. See Wojcik, 874 F.Supp. at 520.

C. Qualified immunity
In response to plaintiffs' claims, defendants raise the defense of qualified immunity. This defense emerged from the Supreme Court's concern that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." Harlow v. Fitzgerald, 457 U.S. 800, 817-18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). With this problem in mind, the Supreme Court exorcized the subjective test once applied to claims of qualified immunity and held "that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. 2727. On a motion for summary judgment, then, it is necessary that "the judge appropriately ... determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." Id. As if the moat were not deep enough, the armament which forms the defense grew more adorned in time. A plaintiff, to prevail, must now allege a right the contours of which "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The task of a court faced with this defense is to ascertain "the objective reasonableness of the defendant's actions." Singer v. Maine, 49 F.3d 837, 844 (1st Cir.1995). The central question becomes "`whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.'" Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91 (1st Cir.1994) (quoting McBride v. Taylor, 924 F.2d 386, 389 (1st Cir.1991)).
Therefore, in order to apply qualified immunity principles, two steps must be taken. First, the Court must determine "whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). "[A]s a predicate to the objective reasonableness inquiry, `a plaintiff must establish that a particular defendant violated the plaintiff's federally protected rights.'" Singer, 49 F.3d at 844 (quoting Febus-Rodriguez, 14 F.3d at 91). Second, plaintiffs must demonstrate that the right was clearly established at the time of the violation using the objective reasonableness test. See id.
Within the context of family law, courts have found some difficulty in determining whether a constitutional right is clearly established to the degree necessary for a plaintiff to penetrate the qualified immunity defense. See Frazier, 957 F.2d at 930. This challenge arises from two concerns: first, "the difficulty of alleging a right with sufficient particularity," and second, "the qualified nature of all rights in this area." Id. Indeed, it would not be enough "for a plaintiff to allege an abstract due process liberty interest in family relationships." Id. Instead, "[t]he qualified immunity defense requires that the constitutional right be stated with particularity." Id.
The First Circuit has recognized a further problem with a right such as familial integrity. Under certain factual circumstances, determining whether the right to familial integrity has been violated requires a balancing test. In Frazier, the plaintiff alleged that the defendants had interfered with his parental relationship with his children by conducting improper investigations into the family sphere. See *530 id. at 929. In particular, the plaintiff claimed that those involved with the investigation manipulated his children in order to produce false reports of sexual abuse. See id. In addressing his claim, the First Circuit acknowledged that "`if the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered "clearly established," at least in the absence of closely corresponding factual and legal precedent.'" Id. at 931 (quoting Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir.1987)). The Court determined that the dimensions of the right to familial integrity had not yet been clearly defined; and that to the extent the right was well-defined, it was "not absolute but rather balanced against the governmental interest." Id. at 929. With this in mind, the Court in Frazier decided that the plaintiff had failed to show that the investigations undertaken by defendants in response to allegations of abuse amounted to violations of his constitutional rights. Ultimately, the Court determined, that the "right to family integrity has not been so particularized as to put defendants on notice that their conduct was unlawful." Id.
The facts of this case are unlike those in Frazier. This Court is not faced with a challenge to the methods used by the state actors to investigate allegations of abuse. Rather, plaintiffs' challenge strikes at the substantive weight of the evidence known to the state officials when Natalia and Sarah were separated from their parents. Plaintiffs' frontal attack is a basic one: did the evidence known to DCYF justify the removals? This Court explained in Wojcik that the Constitution would be offended if "children were taken away from their parents without due process." Wojcik, 874 F.Supp. at 520. It is within this narrow band that the right to familial integrity is clearly established. As far as a parent's right to the care, custody, and management of a child is concerned, a parent has the right not to have his or her child removed without sufficient investigation and credible information supporting a reasonable suspicion that abuse has occurred or will occur imminently.

III. Application of the Facts to the Legal Standards

A. Natalia's claim
The first question this Court must address regarding Natalia's removal is whether the conduct about which plaintiffs complain amounts to a deprivation of any right secured by the Constitution or laws of the United States. This question must be answered in advance of considering defendants' resort to qualified immunity.
In the case of Natalia's removal by Renzi, this first question is dispositive since the conduct complained of can not reasonably be viewed as a deprivation of plaintiffs' rights. There is no doubt that Richard had a constitutional right to the care, custody, and management of his daughter Natalia. There is also no doubt that the state agency had an interest in protecting this child, even from her own father, and had a right to remove her from her home prior to obtaining a court order, in appropriate circumstances.
The circumstances confronting Renzi on the night of Natalia's removal reasonably warranted that extraordinary exercise of state power. The story of October 10th is a sad one. A couple's quarrel had already enticed Richard, a recovering alcoholic, to embark on a binge of dangerous proportions. He had already emptied an entire bottle of vodka, and Lorena believed that he had taken Prozac, Antabuse, and Valium. When the police arrived, Richard was in such a state that he required immediate medical attention. While Richard was transported away by the ambulance, the police advised Lorena to call DCYF and insisted that she complete a witness statement. It is not necessary for this Court to speculate as to whether Lorena believed that the statements she made that night were true. For the purposes of deciding this motion, it is irrelevant whether she believed what she told DCYF on the telephone *531 and in person. What is relevant, however, is what DCYF officials reasonably believed at the time they removed Natalia.
At her deposition, Lorena admitted that she was concerned about Richard's behavior on October 10th because he had been drinking. She had never seen him before in such a state, and she did not know what to expect. Further, in her witness statement, she admitted that she feared that Richard might hurt or neglect Natalia if he remained at home. She was so concerned that she called Richard's therapist, her own therapist, and eventually, paramedics.
Though it is difficult to pinpoint exactly which details the police reported to the child abuse hotline and what level of detail was then passed on to Renzi, it is reasonable to believe that the police communicated to DCYF a description of Richard's drunken and excited state and the general level of turmoil in the household that evening. Furthermore, Renzi noted the following relevant facts supporting Natalia's removal, none of which Lorena denied at her deposition. Renzi reported that Lorena was afraid that she was Richard when she knocked at the door. Lorena also stated that although Richard was not physically abusive to her, he was "out of control" that night.
These facts are undisputed. Furthermore, Renzi had no way of knowing when Richard might return home from court the next morning, nor the emotional state he would be in following his night of self-destructive excess. It is also important to remember that Richard was Natalia's sole legal guardian; Lorena was not the child's mother. Renzi made the reasonable determination that it was necessary for Natalia's safety, given Lorena's fears and Richard's drunken tantrum, to temporarily remove her from the home. When a state agent takes clear steps to ascertain the possible immediate dangers threatening a child's safety and then makes a reasonable determination to temporarily remove the child in order to protect her from an unpredictable and potentially threatening environment, no reasonable jury could determine that a constitutional violation has occurred. Therefore, since no facts are in dispute regarding Natalia's removal and because no constitutional violation could be established based on the undisputed facts in the record, this Court must grant defendants' motion for summary judgment on Count I with respect to Natalia's removal. In short, Richard and Natalia have no sustainable cause of action on these facts under § 1983.

B. Sarah's claim
It is unclear whether facts exist to support the removal of Sarah. In any event, when the facts are viewed in the light most favorable to plaintiffs, this Court must conclude that defendants' motion for summary judgment should be denied.
Looking at the facts in this light, the Court assumes the following. A DCYF social worker told Lorena sometime prior to October 30, 1996 that she could resume living with both Sarah and Richard and that there would be no further repercussions if Richard lived in the family home with Sarah. On this advice, Lorena arranged for Sarah to return home. However, upon learning that Richard was, in fact, living in the home again, Morgan removed Sarah with hardly a moment's attention to evaluating the family's current situation. At best, she based the removal on the facts surrounding Richard's three week-old alcoholic binge and Sarah's report of being slapped once on the face and once on the arm. However, DCYF made no investigation into Richard's condition on October 30th. Nor did Morgan have any evidence that Richard's binge had been anything but a onetime slip off the wagon. Furthermore, the details of Sarah's slaps are murky at best. Were the slaps violent or gently scolding? Was Sarah hurt? Did she cry? These important details are undeveloped in the record. Because defendants rely on the slaps to partially justify *532 Sarah's removal, these disputed facts are material.
Defendants attempt to further justify their action by suggesting that the first removal of Sarah on October 10th was premised on the alleged exposure of the child to pornography. But it is not clear from this record that Sarah was in fact exposed to pornography by Richard. Nor is it clear that Morgan knew anything at the time that might have led her to reasonably suspect that Richard purposely showed Sarah pornography. The parties dispute the facts with regard to Sarah's alleged exposure to pornography. Plaintiffs claim that Sarah's vague descriptions of what she saw on Richard's computer provided insufficient basis for removing the child. This is not a case where a child has made clear statements to a social worker that warrant removal. Sarah's comments to Renzi regarding pornography on the evening of October 10th were unclear, and at best, would have suggested the need for further investigation. Yet Renzi found no pornography in the home.
Further, even if Sarah had been exposed to some type of pornography by Richard's carelessness, this act of negligence hardly grants DCYF a non-expiring pass to remove Lorena's child from her anytime Richard was living in the home. This is especially unreasonable where no steps where taken by Morgan to determine if any further exposure had occurred since October 10th. Defendants' final attempt to support this removal is to suggest that Sarah had been told to lie about Richard living in the home. Again, this fact is in dispute.
Thus, when taken in the light most favorable to plaintiffs, disputed issues of material fact exist that, if proven by plaintiffs, might lead a jury to believe that defendants crossed the Constitutional line. Further, though the boundaries of familial integrity may still be unclear, plaintiffs did not stumble by resting their claims on this abstract right alone. Within that broad right, they have pled the now well-established right to the care, custody, and management of their children, a right that had been established some time before the events in question. Although the outer limits of the right may be abstract, within the context of these facts, its meaning is straightforward: a state agency may not separate parent and child without sufficient investigation, credible information, and a reasonable suspicion of abuse, past or imminent.
Though rights within the familial context may not always be clear enough to destroy the formidable qualified immunity defense, the facts of this case not only pierce the narrow gap in the armor, they find the flesh. As a result, this is not even a case where the issue of qualified immunity becomes entangled in a complex balancing test. If the record is read in the light most favorable to plaintiffs, then no facts exist to suggest that Sarah might have needed protection. DCYF's stale report of Richard's behavior on October 10th and its undeveloped hints of pornography were not enough. Only a jury can decide whether plaintiffs' version of the facts is true. Accordingly, defendants' motion is denied with respect to Lorena and Sarah's claim contained in Count I.

CONCLUSION
For the foregoing reasons, defendants' motion for summary judgment on Count I of the Complaint is granted in part and denied in part. With respect to the claim advanced by plaintiffs Richard and Natalia Mello, the motion is granted. With respect to the claim advanced by plaintiffs Lorena and Sarah Strail, the motion is denied. Therefore, since Richard and Natalia Mello have no standing to seek redress for injuries to Lorena and Sarah, only the claims of Lorena and Sarah Strail remain to be resolved. No judgment shall enter until all claims are resolved.
It is so ordered.